UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ASSOCIATE JUSTICE | * | CIVIL ACTION NO. 2:15-cv-07165 |
| JEFFERSON D. HUGHES III, | * | |
| | * | |
| Plaintiff, | * | JUDGE MARY ANN VIAL LEMMON |
| | * | |
| VERSUS | * | MAGISTRATE JUDGE |
| | * | DANIEL E. KNOWLES, III |
| CHIEF JUSTICE BERNETTE J. JOHNSON, | * | |
| ASSOCIATE JUSTICE GREGG G. GUIDRY, | * | |
| ASSOCIATE JUSTICE MARCUS R. CLARK, | * | |
| AND ASSOCIATE | * | |
| JUSTICE JOHN L. WEIMER, | * | |
| | * | |
| Defendants. | * | |

**************************************

## COMPLAINT IN INTERVENTION FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Vincent Charles Bundrick, Cajun Pride, Inc., Robert L. Walton, Bonnie Walton, John Keith Lamm, Deborah Broussard Lamm, and Citizens for Clean Water and Land PAC, L.L.C. ("CCWL PAC"), appearing as intervenors through their undersigned attorneys, file this complaint of intervention against Defendants, Chief Justice Bernette J. Johnson, in her official capacity as Chief Justice; Associate Justice Greg G. Guidry, in his official capacity as Associate Justice; Associate Justice Marcus R. Clark, in his official capacity as Associate Justice; and Associate Justice John L. Weimer, in his official capacity as Associate Justice, and allege as follows:

### INTRODUCTION

1. The Honorable Associate Justice Jefferson Hughes, III ("Justice Hughes") of the Louisiana Supreme Court (the "LASC"), the original plaintiff, filed his complaint in this action against Defendants, Chief Justice Bernette J. Johnson, in her official capacity as Chief Justice; Associate Justice Greg G. Guidry, in his official capacity as Associate Justice; Associate Justice

Marcus R. Clark, in his official capacity as Associate Justice; and Associate Justice John L. Weimer, in his official capacity as Associate Justice, seeking injunctive and declaratory relief arising out of his recusal in the *Walton* and *Bundrick* cases now pending in the LASC.  In this intervention, intervenors also seek declaratory and injunctive relief arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States, challenging the constitutionality of the LASC's November 12, 2015 orders granting motions to recuse Justice Hughes in the *Walton* and *Bundrick* cases.  In addition, intervenors seek declaratory and injunctive relief arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States, challenging the constitutionality of the LASC's November 12, 2015 orders granting motions to recuse Justice Knoll in the *Walton* and *Bundrick* cases.

2.     Intervenors hereby incorporate by reference all of the allegations of Justice Hughes in paragraphs 2 through 98 of his original complaint.

## JURISDICTION AND VENUE

3.     This action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the Constitution of the United States.

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

5.     Intervenors' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court. Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

6.      Plaintiff Justice Hughes is an Associate Justice of the LASC.   He resides in Livingston Parish, Louisiana.   Intervenor CCWL PAC, L.L.C.   is a Louisiana Limited Liability Company.  All of its members reside in East Baton Rouge Parish.  Intervenor Cajun Pride, Inc. is a Louisiana Corporation with its principal place of business  in Lafayette Parish.   Intervenors Robert L. Walton, Bonnie Walton, John Keith Lamm, and Deborah Broussard Lamm are all citizens of Louisiana who reside in Acadia Parish. Intervenor, Vincent Charles Bundrick, is a citizen of Louisiana who resides in Lafayette Parish.

7.      Defendant, Bernette J. Johnson, is Chief Justice of the LASC.  As a Member of the LASC, her powers and duties include, among other things, the granting of motions to recuse other LASC justices. Chief Justice Johnson acts under color of law and is sued only in her official capacity.

8.      Defendant Associate Justice Greg G. Guidry is an Associate Justice of the Louisiana Supreme Court.  As a Member of the LASC, his powers and duties include, among other things, the granting of motions to recuse other LASC justices.  Associate Justice Guidry acts under color of law and is sued only in his official capacity.

9.      Defendant Associate Justice Marcus R. Clark is an Associate Justice of the Louisiana Supreme Court.  As a Member of the LASC, his powers and duties include, among other things, the granting of motions to recuse other LASC justices.  Associate Justice Clark acts under color of law and is sued only in his official capacity.

10.     Defendant Associate Justice John L. Weimer is an Associate Justice of the Louisiana Supreme Court.  As a Member of the LASC, his powers and duties include, among other things, the

granting of motions to recuse other LASC justices.  Associate Justice Weimer acts under color of law and is sued only in his official capacity.

## FACTUAL AND LEGAL BACKGROUND

11.      The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech."  The motions to recuse Justice Hughes filed by the defendants in the *Bundrick* and *Walton* cases were based entirely **on the independent expenditures** made by the CCWL PAC in support of Justice Hughes.

12.      Pursuant to the First Amendment, there is no limit to the amount of money that a person can contribute to a political action committee for the purpose of **independent expenditures**. *See Citizens United v. Federal Election Com'n,* 558 U.S. 310, 365; *Texans for Free Enterprise v. Texas Ethics Com'n,* 732 F.3d 535, 537-38 (5th Cir. 2013); *Fund for Louisiana,* 17 F. Supp. 3d 562 (E.D. La. 2014) 571-572. **Independent expenditures are not campaign contributions**. (See *Buckley v. Valeo,* 424 U.S. 1, 45-47; *Citizens United, supra,* at 360: "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate."). Campaign contributions are payments made directly to a candidate that the candidate can spend at his direction. By contrast, independent expenditures are expenditures that are not made in cooperation, consultation or concert with, or at the request or suggestion of, a candidate. PACs such as the CCWL PAC can also make expenditures in connection with "issue ads" that do not expressly advocate the election or defeat of a clearly identified candidate. Louisiana's Campaign Finance Disclosure Act (La. R.S. 18:1483 *et seq.*) requires a PAC that participates in an election by making independent expenditures in support of a specific candidate to file campaign finance disclosure reports in connection with that election. The CCWL PAC did not make any independent

expenditures in support of Justice Hughes until October 26, 2012, just eleven days before the primary election.

In their motions to recuse filed in the LASC, the defendants in the *Bundrick* and *Walton* cases relied primarily on the Supreme Court's ruling in *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). However, as shown by the detailed allegations of Justice Hughes in his original complaint, the facts here can in no way be compared to the "extraordinary" facts that caused the United States Supreme Court to recuse Justice Benjamin on constitutional grounds in *Caperton.*

13.     Justice Hughes was elected to serve on the LASC on December 8, 2012. Both *Bundrick* and *Walton* cases were pending in the trial court on the date of his election. The *judgment of the trial court* dismissing the pre-purchase damage claims of the *Bundrick* plaintiffs was signed on May 13, 2014, and an order of appeal was signed on June 12, 2014. The motions for summary judgment upon which the final judgment in *Bundrick* was based were filed almost fifteen months *after* the election of Justice Hughes. The *judgment of the trial court* dismissing the pre-purchase damage claims of the *Walton* plaintiffs was signed on April 25, 2014, and an order of appeal was signed on May 2, 2014. The writ application at issue in *Bundrick* was filed in the LASC on March 19, 2015, and the motion to recuse Justice Hughes was filed 35 days later on April 23, 2015. The writ application at issue in *Walton* was filed in the LASC on March 20, 2015, and the motion to recuse Justice Hughes was filed 34 days later **on April 23, 2015.** The date of **April 23, 2015** is of critical importance, as the LASC handed down its writ denial in *Global Marketing Solutions, L.L.C., v. Blue Mill Farms, Inc., et a,* S. Ct. Docket No. 2014-C-2572 on that day. *Global Marketing* is a legacy case involving defenses based on the "subsequent purchaser rule." The issues raised by the plaintiff writ applicants in *Global Marketing* are indistinguishable from the issues raised by the writ

applicants in *Walton* and *Bundrick* . By contrast with *Bundrick* and *Walton*, the writ application in *Global Marketing* was filed with the LASC on December 9, 2014, and the respondents did not file a motion to recuse Justice Hughes *until 135 days later on April 23, 2015*, which coincidentally is the very same day upon which Global Marketing's writ application was denied. **Respondents' recusal motion came too late, as Justice Hughes had already participated in and dissented from the LASC's ruling denying writs in *Global Marketing*.** Significantly, Exxon is a defendant/respondent in *Bundrick*, *Walton* and *Global*, and *Chevron* is a defendant/respondent in *Bundrick* and *Global*. These indisputable facts suggest that the motion to recuse Justice Hughes in *Global Marketing* was nothing more than a ruse, and that Exxon and Chevron filed their recusal motions in *Bundrick* and *Walton* only after learning from the LASC's writ denial ruling in *Global Marketing* that Justice Hughes apparently did not agree with their position on the "subsequent purchaser rule."

14.     CCWL PAC was formed on June 14, 2012. The CCWL PAC was formed for the purpose of publicizing the views of its members concerning common sense solutions to land and water pollution problems, and for the purpose of ensuring the effective advocacy of these views in legislative and judicial forums. In contrast to the PAC in *Caperton,* the CCWL PAC was not formed for the sole purpose of supporting candidates, let alone any specific judicial candidate. The CCWL PAC expended considerable sums in "issue advocacy" in an attempt to influence public opinion on environmental issues in general and the serious groundwater depletion and pollution problems faced by the State and the public in particular.  After its formation, the CCWL PAC established its presence in the Baton Rouge community through extensive radio advertising, the creation of a website, social media, and graphic design. The CCWL PAC also conducted extensive opinion polls seeking information concerning the public's views on a wide variety of environmental issues. Public

records show that at least $289,038 of the CCWL PAC expenditures in 2012 were unrelated to its support of Justice Hughes. The CCWL PAC did not endorse Justice Hughes until October 26, 2012, just eleven days before the primary election. Prior to this endorsement, the CCWL PAC made no independent expenditures in support of any Supreme Court candidate. In fact, over ninety six percent of the total of $289,038 in non-Hughes expenses ($278,579) of the CCWL PAC was spent before the Hughes endorsement. A total of $575, 570 was contributed to the CCWL PAC *before* the Hughes endorsement. $275,000 of this $575, 570 in contributions (48%) were made by Talbot, Carmouche and Marcello. Thus, *at least* $132,000 in contributions to the CCWL PAC by Talbot, Carmouche and Marcello (48 % of $275,000 = $132,000) cannot be attributed to expenditures by Talbot, Carmouche and Marcello in support of Justice Hughes. Talbot, Carmouche and Marcello contributed a total of $360,025 to the CCWL PAC before the election of Justice Hughes. Accordingly, at most, only $228,025 ($360,025 - $132,000 = $228,025) of the independent expenditures of the CCWL PAC in support of Justice Hughes can be attributed to Talbot, Carmouche and Marcello.

Almost half of the non-Hughes expenditures of the CCWL PAC were used to purchase TV ads to inform the public regarding the dire consequences of the overuse of the Baton Rouge drinking water aquifer ("Southern Hills aquifer"). The ad featured local activists A. Hayes Towne, Jr. (an engineer and son of the famous architect) and Jimmy Jenkins (former Secretary of the Louisiana Department of Natural Resources), who have for many years compiled convincing evidence that the overuse and depletion of Southern Hills aquifer has resulted in extensive saltwater intrusion, thus endangering the Baton Rouge drinking water supply. This informational campaign had nothing

whatsoever to do with the support of any candidate in the District 5 Supreme Court race, but had everything to do with the protection of usable groundwater for the citizens of Baton Rouge.

After the qualifying deadline for the vacancy created by Chief Justice Kimball's retirement, the CCWL PAC financed a series of polls testing the strengths and weaknesses of each potential candidate. The CCWL PAC also conducted interviews with all of the candidates for the purpose of determining whether it should support a particular candidate in the race. Contrary to the practices of the Louisiana Association of Business and Industry (LABI), no candidate for the seat to replace Chief Justice Kimball was ever asked by a representative of the CCWL PAC or any of its members why he or she voted a certain way on a particular case.

On October 26, 2012, CCWL PAC made the decision to support Justice Hughes in the primary. Prior to October 26, 2012, some of the candidates requested, and were granted, access to the CCWL PAC's polling data. At no time before or after the CCWL PAC's endorsement of Justice Hughes was there ever any coordination between the CCWL PAC and the Hughes campaign. At no time prior to October 26, 2012 did the CCWL PAC make any independent expenditures for any Supreme Court candidate.

The recusal motions filed in *Bundrick* and *Walton* identify a group of lawyers described as "Plaintiff Legacy Attorneys." Significantly, *only one* of the law firms in this group —Talbot, Carmouche and Marcello—is involved in the *Walton* and *Bundrick* LASC proceedings. Except for the members of Talbot, Carmouche and Marcello (hereinafter "TCM"), no other contributor to the CCWL PAC has any interest whatsoever in the "individual" *Bundrick* and *Walton* cases.

15.     In *Caperton*, the United States Supreme Court concluded that "***when a person with a personal stake in a particular case*** had a significant and disproportionate influence in placing the

judge on the case by raising funds or directing the judge's election campaign *when the case was pending or imminent*," the risk of actual bias is "serious." When these *threshold requirements* are met, courts are required to determine whether the risk of actual bias is too high to ensure the protection of due process.  This determination is made by examining the following factors: (1) the size of the contribution in comparison to the total campaign contribution amount; (2) the total sum spent during the election; (3) the effect that the contribution may have had on the election's outcome; and, (4) the timing of the campaign contribution in relation to the judge's election and the status of the contributor's case. These four factors must be applied on a case-by-case basis. *Caperton* recusals are limited to "exceptional" or "extreme" cases. Justice Kennedy, writing for the majority in *Caperton*, used the word "extraordinary" four times to characterize Blankenship's contributions. His opinion employs the word "extreme" seven times, observing at one point: "The facts now before us are extreme by any measure." Thus, under the facts of the present case, **even the threshold requirements of *Caperton* cannot be met.**

The defendants in *Bundrick* and *Walton* attempted to satisfy the *Caperton* threshold requirements by impermissibly expanding the number of persons "with a personal stake in a particular case." The other "Plaintiff Legacy Attorneys" who contributed to the CCWL PAC did not have an interest in the "particular" *Bundrick* and *Walton* cases. In an effort to dramatically inflate the amount of funds spent in support of Justice Hughes for purposes of their *Caperton* analysis, the defendants in their motions to recuse in *Walton* and *Bundrick* impermissibly aggregated the CCWL PAC contributions of TCM  with the contributions of the remaining Plaintiff Legacy Attorneys who contributed to the CCWL PAC, but who have absolutely no interest in these "particular case[s]." To make matters worse, defendants in the *Walton* and *Bundrick* cases did not even bother to ascertain

whether these other legacy attorneys had any pending cases of their own that involved the "subsequent purchaser" issue, which was the sole issue before the LASC on the *Walton* and *Bundrick* writ applications at issue.

The only "persons with a particular stake" in the *Walton* and *Bundrick* cases that contributed to the CCWL PAC were the lawyers of TCM.  The contributions of TCM to the CCWL PAC totaled $360,025, and a substantial portion of that amount (almost 37%) **was not spent in support of the candidacy of Justice Hughes**. Under the circumstances of the Hughes election, such an amount is far, far less than the "extraordinary" amount that would "pose [] a risk of actual bias" under *Caperton*. In fact, even the total of $360, 025 contributed by TCM to the CCLW PAC (a large portion of which was not spent on the election) would not "pose [] a risk of actual bias" under *Caperton* standards.

16.     The total amount spent in support of Justice Hughes was $1,076,020. TCM's share of total campaign expenditures in support of Justice Hughes was **less than 21 percent**, whereas in *Caperton*,  Blankenship alone **spent 300 percent more** than Benjamin's own campaign committee. TCM's independent expenditures for Justice Hughes were less than 7.5 percent of the total funds spent by all the candidates and committees or PACs in the 2012 Louisiana Supreme Court race ($3,029,063), and when compared to *Caperton*, less than 7.5 percent of Blankenship's contributions in support of Justice Benjamin.

The independent expenditures of the lawyers of TCM (*via* the CCWL PAC) in support of Justice Hughes simply do not remotely approach the numbers the United States Supreme Court was forced to contend with in *Caperton*. Even the total combined independent expenditures of all of the

alleged Plaintiff's Legacy Attorneys in support of Justice Hughes pale in comparison to the contributions made in *Caperton*.

The defendants in *Walton* and *Bundrick* alleged in their motions to recuse that the CCWL PAC spent $486,124 in support of Justice Hughes, and that the "Plaintiff Legacy Attorneys" together contributed $454,525.94 of that amount. Thus, the "Plaintiff Legacy Attorneys" contributed 42 percent of the funds spent in support of Justice Hughes, and less than 16 percent of the total funds spent on the election. Again, these numbers stand in stark contrast to the numbers in *Caperton*.

17.     In addition, the timing of the contributions by the CCWL PAC does not satisfy the *Caperton* threshold requirements. The trial court rulings and judgments challenged in the writ proceedings filed in the LASC by the plaintiffs in *Walton* and *Bundrick* were not entered until more than a year *after Justice Hughes was elected*. By contrast, in *Caperton*, Blankenship made his extraordinary contributions to Benjamin *after* the $50 million jury verdict against Massey when he knew that, absent recusal, Benjamin would sit in judgment of Massey's case if he won the election. As noted by the Supreme Court in *Caperton,* "the temporal relationship between the campaign contributions, the justice's election, and the pendency of the case **is also critical**." Unlike *Caperton*, **no decision** had been made in the trial court in *Bundrick* or *Walton* before the election of Justice Hughes to the LASC. It would have been rank speculation for anyone to conclude that it was apparent before Judge Hughes' election that he would review judgments in either *Bundrick* or *Walton as a member of the LASC*. Because of the requirement of a temporal relationship between the contributions and the election, it is highly doubtful that the *Caperton* case itself would have ever reached the United States Supreme Court had the jury verdict in that case been rendered more than a year after the election of Justice Benjamin. *Caperton* was the sole basis alleged by the defendants

for their recusal motions targeting Justice Hughes in *Walton* and *Bundrick,* and the LASC's granting of these motions without written reasons strongly suggests the LASC itself does not believe that *Caperton* supports the recusal of Justice Hughes.

18.     Article V, Section 3 of the Louisiana Constitution provides in pertinent part: "The supreme court **shall be** composed of a chief justice and six associate justices, four of whom must concur to render judgment."   The only written recusal rule in Louisiana that applies specifically to the LASC is article 159 of the La. Code of Civil Procedure.   This rule provides:

> When a written motion is filed to recuse a justice of the supreme court, he may recuse himself or the motion shall be heard by the other justices of the court. When a justice of the supreme court recuses himself, or is recused, the court may (1) have the cause argued before and disposed of by the other justices, or (2) appoint a judge of a district court or a court of appeal having the qualifications of a justice of the supreme court to act for the recused justice in the hearing and disposition of the cause.

Code of Civil Procedure article 159 directly violates the explicit provisions of Article V, Section 3 of the Louisiana Constitution because it allows judgments to be rendered by a Supreme Court composed of less than seven judges.  It appears from the orders issued by the LASC that only five justices decided both the recusal motions and the merits of the pending writ applications in *Walton* and *Bundrick.* The granting of the motions to recuse Justices Hughes and Knoll by a court composed of only five justices directly violates Article V, Section 3 of the Louisiana Constitution and establishes dangerous precedent, in that a minority of three justices of the Court under this scenario can control the outcome of any case. If the judgments recusing Justices Knoll and Hughes are allowed to stand, a minority  court, however configured, will be invested with the arbitrary power to reconfigure the court to finally and definitively adjudge the rights of litigants.

19.     More importantly, however, and aside from procedural rule expressed in article 159 of the Code of Civil Procedure involving the configuration of the LASC itself, the LASC has adopted no rule that establishes the specific procedures and rules to be followed in determining a contested motion for disqualification or recusal.  Unlike other state supreme courts, the litigants in contested disqualification and recusal motions in the LASC are not accorded the right to published written reasons supporting or denying such motions.  Under the Louisiana constitution, the *Walton* and *Bundrick* plaintiffs are entitled to have their respective cases decided by an elected state Supreme Court composed of seven justices.  When one or more justices can be removed from the court at the whim of the remaining justices without out any written justification whatsoever, these plaintiffs have been denied procedural due process. At a minimum, a rule that requires written reasons for rulings in contested recusal and disqualification motions is the only means of protecting an opposing party's right to minimum due process, as the absence of such a rule permits the arbitrary reconfiguration of the court in the absence of valid grounds for removal or disqualification.  The LASC's failure to provide written reasons denies plaintiffs the facts needed to articulate a challenge to its ruling.

20.     One example of how a state supreme court should protect the due process and free speech rights of litigants is found in the disqualification and recusal rules adopted by the Michigan Supreme Court.  This rule reads as follows:

(a)     For courts other than the Supreme Court, the challenged judge shall decide the motion.  If the challenged judge denies the motion,

    *(i)*     in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo;

    *(ii)*     in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state

court administrator for assignment to another judge, who shall decide the motion de novo;

(b)    In the Supreme Court, if a justice's participation in a case is challenged by a written motion or if the issue of participation is raised by the justice himself or herself, the challenged justice shall decide the issue and publish his or her reasons about whether to participate.

If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court. The entire Court shall then decide the motion for disqualification de novo. The Court's decision shall include the reasons for its grant or denial of the motion for disqualification. The Court shall issue a written order containing a statement of reasons for its grant or denial of the motion for disqualification. Any concurring or dissenting statements shall be in writing.

Court rules such as the Michigan rule provide the minimum due process protections owed to the litigants, the public, and the justice or justices that may be the target of a motion to disqualify or recuse. By contrast, the order of the LASC recusing Justices Hughes and Knoll fails to disclose the reasons for the Court's recusal orders, fails to disclose the vote of the remaining justices who voted on the recusal motions, and fails to disclose the reasons for any dissent. As shown by the factual allegations set forth herein, it would have been impossible for the remaining justices to articulate a rational basis for recusing Justice Hughes, if such recusal was indeed based on *Caperton*. The LASC's failure to publish reasons for its recusal orders suggests that the recusal orders were the result of reasoning untethered to any stated procedural or substantive rule or constitutional principle. The defendants who joined in the motion to recuse Justice Hughes alleged that Justice Hughes was prejudiced, but based this allegation solely on the independent expenditures of the CCWL PAC. If Justice Hughes's recusal was based on *Caperton*, the LASC is constitutionally required to say so, in writing, so that the litigants and the CCWL PAC can seek a reversal of the LASC's decision either here or in the United States Supreme Court.

21.     The oil company defendants in *Walton* and *Bundrick* were also successful in recusing Justice Knoll on grounds that her husband, Eddie Knoll, has appeared as plaintiffs' counsel in a limited number of "Plaintiff Legacy Cases." Eddie Knoll has never represented any of the plaintiffs in *Walton* or *Bundrick*, so he clearly was not a "person[] with a particular stake" in the *Walton* and *Bundrick* cases as described in *Caperton*.  Undeterred by Eddie Knoll's lack of a "particular stake" in these cases, the oil company defendants argued that Justice Knoll should be recused because: (1) the issue on consideration in *Walton* and *Bundrick* was the application of the "subsequent purchaser rule" to "legacy litigation," and (2)  Eddie Knoll was handling a hand full of cases that may be impacted by the LASC's eventual determination regarding the applicability of the subsequent purchaser rule in "legacy litigation." The "subsequent purchaser rule" provides that the owner of property at the time the pollution occurs has the right to bring the private law claims for remediation of the pollution, and  a subsequent owner of the property cannot assert such claims absent an express assignment.

22.     The "subsequent purchaser rule" is just one of many defenses that are commonly raised in legacy litigation. When the defendants moved to recuse Justice Knoll in the *Walton* and *Bundrick* cases, her husband Eddie Knoll was not counsel of record in any legacy case pending in the LASC,  and was counsel of record in only four pending legacy cases,  three of which did not involve the "subsequent purchaser rule." Further, Justice Knoll has participated in the decision of several legacy cases heard by the LASC, including the authorship of the landmark *M. J. Farms* decision in favor of the oil company defendants upholding the constitutionality of Act 312 of 2006 (La. R.S. 30:29), a major piece of legacy reform legislation sponsored by the oil companies. *M. J. Farms, Ltd. v. Exxon Mobil Corp.,* 2007-2371 (La. 7/1/08), 998 So. 2d 16,  amended on reh'g (Sept.

19, 2008). *Recently*, Justices Knoll and Hughes participated in a case *involving the application of the subsequent purchaser rule in a legacy case. Pierce v. Atl. Richfield Co.*, 2014-1233 (La. 3/17/15), 166 So. 3d 996.

23.     Apparently the only court to address the issue of whether *Caperton* should be expanded to persons beyond "persons with a stake in a particular case" is the Michigan Supreme Court. That Court expressly rejected an attempt to apply *Caperton* to an entire class or category of cases.

In *U.S. Fid. Ins. & Guar. Co. v. Michigan Catastrophic Claims Ass'n*, the defendant moved to recuse Michigan's Justice Hathaway, whose spouse's practice was concentrated in the area of no-fault insurance law. The opinion of the justice states:

> Despite the theories proffered by the MCCA, my husband has no connection to or financial interest in this matter. He is not an attorney for or employee of any party, nor is he a litigant in either of these cases. He has no relationship with either the attorneys or the litigants in these cases. The MCCA asserts that, because my spouse has handled cases in the field of no-fault insurance law, I must recuse myself. However, this assertion suggests a basis for recusal that is so attenuated from the facts of these cases that it strains reasoned logic." 484 Mich. 45, 46, 773 N.W.2d 243, 244 (2009).

The majority of the Michigan Supreme Court supported Justice Hathaway's refusal to grant the motion to recuse. Apparently that Court would opine, if asked, that the LASC's decision to recuse Justice Knoll also "strains reasoned logic."

24.     As a general rule, recusal or disqualification motions are limited to actual issues of bias or prejudice that relate directly to the particular case before the court. See La. C.C.P. art. 151. For example, the Federal Eighth Circuit refused to recuse a district court judge that owned stock in a non-party company that might be affected by the ruling in the case before the district court:

Furthermore, we are reluctant to fashion a rule requiring judges to recuse themselves from all cases that might remotely affect nonparty companies in which they own stock. We believe such a rule would paint with too broad a stroke. By way of example, a judge holding stock in General Motors should not have to recuse from a case involving Ford Motor Company because some ruling he may make might be used as persuasive authority in a case against GM. Cf. *In re Placid*, 802 F.2d 783, 786–87 (5th Cir.1986) (rejecting argument that recusal is required when judge owns stock in nonparty bank and case before him may have impact on banking industry). As a general matter, the administratively daunting task of identifying such tangential "interests" outweighs any benefit of eliminating the remote possibility of consequential bias. *In re Kansas Pub. Employees Ret. Sys.*, 85 F.3d 1353, 1362 (8th Cir. 1996).

The fact that non-party legacy lawyers may be affected by the LASC's ruling in *Bundrick* and *Walton* is irrelevant to the determination of the recusal issues in these particular cases. Justice Knoll's husband has no interest in these cases. The family members of *any* sitting LASC Justice who are practicing lawyers are potentially positively or negatively affected by *any decision* of the LASC under the immethodical and speculative reasoning employed by the LASC in recusing Justice Knoll.

Unlike Justice Hughes,  Justice Knoll responded in writing to the LASC's order of recusal in the *Walton* and *Bundrick* cases.  Her trenchant opinion observes that the LASC " has engaged in a high handed attempt . . .to manipulate the outcome of this case." See attached Exhibit 1, opinion of Justice Knoll.

25.     Before their recusals in *Walton* and *Bundrick*, Justices Knoll and Hughes participated in a case *involving the application of the subsequent purchaser rule in a legacy case*. *Pierce v. Atl. Richfield Co.*, 2014-1233 (La. 3/17/15), 166 So. 3d 996.  In December, 2011, *before the election of Justice Hughes*, the jury in a legacy case rendered a $52 million verdict in favor of plaintiffs and against Shell Oil Company. The judgment of the trial court ordered that $4 million of the verdict be deposited into the court registry for a clean up of the property under La. R.S. 30:29.  The plaintiffs

and the defendants appealed the trial court's judgment.  In *Savoie v. Richard*, 2013-1370 (La. App. 3 Cir. 4/2/14), 137 So. 3d 78, *reh'g denied* (May 21, 2014), *writ denied*, 2014-1283 (La. 11/14/14), 152 So. 3d 880 and *writ denied*, 2014-1287 (La. 11/14/14), 152 So. 3d 880, the court of appeal amended the judgment of the trial court by requiring that $34 million be deposited into the court registry.  The judgment was affirmed by the court of appeal *as amended.* Both Shell and the plaintiffs applied for writs in the LASC. On April 2, 2014, the LASC denied both writ applications. See 152 So. 3d 880.  Justices Hughes and Knoll participated in the decisions on these writ applications, and voted (together with the Chief Justice) to grant plaintiffs' writ application **and to grant Shell's writ application**.  The law firm that filed the motions to recuse in *Walton* and *Bundrick* in 2015 also represented Shell in *Savoie v. Shell.*  That firm did not file motions to recuse either Justice Hughes or Justice Knoll in *Savoie v. Shell.*

## THE CONSTITUTIONAL LIMITS ON THE LASC

26.     By forcing Justice Hughes' recusal based on the contributions of the CCWL PAC, four justices of the LASC have in effect limited the amount of money a person can contribute to a political action committee for the purpose of independent expenditures in support of a candidate, in violation of the First Amendment and *Citizens United.*

27.     By forcing Justice Hughes' recusal based on a person's contributions to the CCWL PAC, four justices of the LASC have violated the constitutional rights of the intervenors by limiting political speech that is protected by the First Amendment.  While LASC justices have the power to grant a motion to recuse pursuant to La. C.C.P. art. 151, *et seq.,* they cannot do so in a manner that violates the fundamental constitutional rights of free speech and due process.

28.     Prior to the election of Justice Hughes, the LASC adopted no rules limiting the independent expenditures that could be made by any person or corporate entity in judicial elections. Likewise, there were no constitutionally valid limitations on independent expenditures in support of a judicial candidate that were imposed by the Louisiana law applicable to the election of Justice Hughes.  Four justices of the LASC  have effectively imposed upon intervenors, and the public at large,  a retroactive, but still undefined, cap on independent expenditures in support of a judicial candidate. This retroactive cap on independent expenditures violates intervenors' free speech and due process rights under the United States Constitution. The Fourteenth Amendment requires that due process be afforded in that laws provide fair warning to those within its scope, that clear standards for enforcement of the law exist, and that no law should inhibit the exercise of basic constitutional freedoms. Under the facts of the present case, there is no standard, much less a clear standard, and there is no rule of enforcement, much less a clear rule. To base a recusal on a non-existent rule or standard constitutes an egregious violation of the basic constitutional rights to free speech and due process.  In fact, in August 2014, the ABA House of Delegates adopted a resolution urging states to adopt disqualification rules that address **independent campaign contributions**.  The concern of the House of Delegates is obvious— an absence of clear standards renders a recusal or disqualification based on the level of independent expenditures in support of a judicial candidate constitutionally suspect. The independent expenditures of the CCWL PAC in support of Justice Hughes were made under the assumption that they were legal and that there was no limit to such expenditures. While certainly the LASC, or the legislature, is free to impose limits on independent expenditures that are consistent with the *Citizens United* and *Caperton* cases, **the retroactive and arbitrary imposition of such limits egregiously violates due process.** The CCWL PAC diligently

followed the laws and regulations applicable to independent expenditures in its support of Justice Hughes, including Louisiana's Campaign Finance Disclosure Act (La. R.S. 18:1483 *et seq.*). In filing their motions for recusal of Justice Hughes, the oil company defendants were in effect seeking to change the rules of the election after the election was over. The LASC should never have allowed this to happen.

29.     The underlying *Walton* and *Bundrick* lawsuits filed by the intervenors involved claims for damages to lands damaged as a result of the oil company defendants' breaches of their lease restoration obligations and as a result of tortious acts committed by the oil companies defendants while conducting oil and gas exploration and production activities. The plaintiffs in the *Walton* and *Bundrick* cases, and their lawyers who contributed to the CCWL PAC, had property interests that were directly impacted by the LASC's grant of the motions to recuse Justices Hughes and Knoll. As such, these state court plaintiffs and their lawyers were denied due process of law.

30.     The number of justices voting in favor of the recusal of Justice Hughes is known to intervenors and the public by virtue of the allegations made in the original complaint in this action. The number and identity of the justices voting in favor of the recusal of Justice Knoll has not been publicized. By recusing Justice Knoll, those justices who voted in favor of recusing Justice Knoll have violated the constitutional rights of the intervenors by depriving intervenors of their due process rights under the Fourteenth Amendment of the United States Constitution.

31.     In summary, this action seeks protection of the free speech and due process rights of plaintiffs. Based on groundless assertions of violations of their due process rights in the *Walton* and *Bundrick* cases, the oil company defendants convinced the LASC to recuse Justices Hughes and Knoll. The resolve of any court to hew to basic constitutional principles is nowhere more tested than

when such principles are in apparent conflict. Here, the oil companies' alleged violations of their due process rights cannot be squared with *Caperton.* In its attempt to protect the due process rights of the oil companies by granting their motions to recuse, the LASC has egregiously violated the free speech and due process rights of the plaintiffs, apparently yielding to the pressure of outside special interest business groups arising from shameless, unsubstantiated attacks on the image of the Louisiana court system in general, and on "legacy lawsuits" in particular. In its recusal of Justice Knoll, the LASC was apparently swayed by an argument that was summarily rejected in a similar case decided by the Michigan Supreme Court, which described the argument in the recusal motion as " so attenuated from the facts . . . that it strains reasoned logic." Neither the intervenors, nor the public at large, share the views of those cynical business groups that habitually inveigh against the Louisiana judiciary or its members based on reckless and unsubstantiated speculation.

32.     Intervenors *do not seek* attorneys fees or costs. Intervenors reiterate that the Honorable Justices of the LASC named as defendants are sued herein only in their official capacities.

## PRAYER FOR RELIEF

WHEREFORE, Intervenors respectfully request that this Court:

I.      Issue a declaratory judgment that the LASC's November 12, 2015 recusal orders are unconstitutional and unenforceable;

II.     Issue a declaratory judgment declaring: (a) that Justice Hughes' forced recusal from *Walton* and *Bundrick* violated intervenors' First Amendment Rights and Due Process rights, and (b) that Justice Knoll's forced recusal violated intervenors' Due Process rights;

III.     Issue a preliminary and permanent injunction, without bond, enjoining Defendants from recusing Justices Hughes and Knoll from *Walton* and *Bundrick*;

IV.      Issue a permanent injunction enjoining Defendants from recusing Justices Hughes and Knoll, and any other LASC justice from a case based on contributions to political action committees that supported their respective elections;

V.       Award to Justice Hughes such other relief that the Court deems just and appropriate.

Respectfully submitted:

/s/ Victor L. Marcello (9252)
TALBOT, CARMOUCHE & MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Phone: (225) 400-9991
Fax: (225) 448-2568
Donald T. Carmouche, Bar #2226
Victor L. Marcello, Bar # 9252
John H. Carmouche, Bar #22294
William R. Coenen, III, Bar #27410
Todd J. Wimberley, Bar #34862
Brian T. Carmouche, Bar #30430
Ross J. Donnes, Bar #33098
D. Adele Owen, Bar #21001
Leah C. Poole, Bar #35092
Caroline H. Martin, Bar #33308
vmarcello@tcmlawfirm.net

*Attorneys for Intervenors, Vincent Charles Bundrick, Cajun Pride, Inc., Robert L. Walton, Bonnie Walton, John Keith Lamm, Deborah Broussard Lamm, and Citizens for Clean Water and Land PAC, LLC*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ASSOCIATE JUSTICE** | * | **CIVIL ACTION NO. 2:15-cv-07165** |
| **JEFFERSON D. HUGHES III,** | * | |
| | * | |
| **Plaintiff,** | * | **JUDGE MARY ANN VIAL LEMMON** |
| | * | |
| **VERSUS** | * | **MAGISTRATE JUDGE** |
| | * | **DANIEL E. KNOWLES, III** |
| **CHIEF JUSTICE BERNETTE J. JOHNSON,** | * | |
| **ASSOCIATE JUSTICE GREGG G. GUIDRY,** | * | |
| **ASSOCIATE JUSTICE MARCUS R. CLARK,** | * | |
| **AND ASSOCIATE** | * | |
| **JUSTICE JOHN L. WEIMER,** | * | |
| | * | |
| **Defendants.** | * | |

*********************************************

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of January, 2016, I electronically filed the forgoing with the Clerk of Court by using the CM/ECF system. The forgoing has also been served electronically on all known counsel of record.

Kyle Schonekas
Mandie Landry
SCHONEKAS, EVANS,
McGOEY & McEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, LA 70112
kyle@semmlaw.com
landry@semmlaw.com
*Attorneys for Jefferson D. Hughes III*

Kim M. Boyle
PHELPS DUNBAR, LLP
365 Canal Street, Suite 2000
New Orleans, LA 70130-6534
*Attorney for Defendants*

*/s/ Victor L. Marcello (9252)*